### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BEN SLINGERLAND, TERRI REESE, ERIC HALL, GINGER GILMORE, and POST-SEASON CONSULTING, LLC**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**ONBALANCE, LLC, and WALTER N. NORLEY**<br><br>**Defendants.** | **CIVIL ACTION NO.:**<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................... 1

JURISDICTION AND VENUE ...................................................................................................... 1

PARTIES ........................................................................................................................................ 2

STATEMENT OF FACTS – GENERAL......................................................................................... 5

ADDITIONAL STATEMENT OF FACTS – SLINGERLAND ...................................................... 6

ADDITIONAL STATEMENT OF FACTS – REESE ................................................................... 10

ADDITIONAL STATEMENT OF FACTS – HALL...................................................................... 14

ADDITIONAL STATEMENT OF FACTS – GILMORE AND PSC ........................................... 19

CLAIMS FOR RELIEF ................................................................................................................ 26

    Count I - Breach of Contract - Employment Agreements ...................................................... 26

    Count II - Breach of Contract – PSC Consultant Agreement ............................................... 29

    Count III - Unjust Enrichment ............................................................................................... 30

    Count IV –Violation of the Massachusetts Wage Act ........................................................... 31

    Count V –Violation of the Pennsylvania Wage Payment and Collection Law ................... 33

    Count VI – Violation of the New Jersey Wage Payment Law ............................................. 34

    Count VII - Violation of the Lanham Act, 15 U.S.C. § 1125(a) ........................................... 36

    Count VIII - Violation of Fla. Stat. § 540.08: Right of Publicity ........................................ 38

    Count IX - Violation of Common Law Right of Publicity .................................................... 40

    Count X – Promissory Estoppel............................................................................................. 42

    Count XI – Breach of Fiduciary Duty.................................................................................... 43

    Count XII – Negligence and Wantonness.............................................................................. 44

    Count XIII – Negligence and Wantonness ............................................................................ 44

    Count XIV – Fraudulent Misrepresentation and Concealment............................................. 46

    Count XVI – Fraudulent Misrepresentation .......................................................................... 48

PRAYER FOR RELIEF ................................................................................................................ 49

JURY DEMAND........................................................................................................................... 50

Plaintiffs Ben Slingerland ("Slingerland"), Terri Reese ("Reese"), Eric Hall ("Hall"), Ginger Gilmore ("Gilmore"), and Post-Season Consulting, LLC ("PSC") (collectively, "Plaintiffs"), by their undersigned counsel, and bring this action against OnBalance, LLC ("OnBalance") and Walter N. Norley ("Norley") (together, "Defendants") for damages and other legal and equitable relief.  In support thereof, the Plaintiffs state the following:

## INTRODUCTION

1.      Plaintiffs bring this action to recover damages including, but not limited to, compensatory and punitive damages, unpaid wages, liquidated damages, pre- and post-judgment interest, and reasonable attorneys' fees and costs as a result of Defendants' breach of contract, unjust enrichment, misrepresentations and false promises, and willful violations of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1 *et seq.,* the Massachusetts Wage Act ("Wage Act"), Mass. Gen. Laws Ann. ch. 149, §§ 148-150 *et seq.,* the New Jersey Wage Payment Law ("WPL"), N.J.S.A. 34:11-4.3 *et seq.,* and the Lanham Act, 15 U.S.C. § 1125(a), *et seq.*

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has original federal question jurisdiction over claims in this action pursuant to 28 U.S.C. § 1331 as Plaintiff Gilmore has stated claims under the Lanham Act, 15 U.S.C. § 1125(a), *et seq.*  This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

3.      This Court has personal jurisdiction over the Defendants because OnBalance carries on a continuous and systematic part of its general business within Pennsylvania and the

1

Plaintiffs' claims arise out of or relate to the Defendants' activities in Pennsylvania.[1] This Court has personal jurisdiction over Norley because he has sufficient minimum contacts with Pennsylvania, has a residence there, transacts business there, and committed several of the acts from which the Plaintiffs' claims arise while doing business in Pennsylvania. Norley transacts business in this Commonwealth, contracts to supply services in this Commonwealth, and caused harm or tortious injury by an act or omission in this Commonwealth.

4.      This Court is a proper venue for this case pursuant to 28 U.S.C. § 1391, as the Defendants reside in this judicial district, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and the Defendants are subject to this Court's personal jurisdiction with respect to this action.

**<u>PARTIES</u>**

5.      Plaintiff Slingerland is a citizen of the Commonwealth of Massachusetts and during times relevant to this Complaint, was employed by OnBalance, LLC and Norley.

6.      Plaintiff Reese is a citizen of the State of New Jersey and during times relevant to this Complaint, was employed by OnBalance, LLC and Norley.

7.      Plaintiff Hall is a citizen of the State of Florida and during times relevant to this Complaint, was employed by OnBalance, LLC and Norley.

8.      Plaintiff Gilmore is a citizen of the State of Alabama and during times relevant to this Complaint, was employed by OnBalance, LLC and Norley.

9.      Plaintiff Post-Season Consulting, LLC is an Alabama limited liability company with a principal place of business in Tuscaloosa, Alabama.

---

[1]   *See* <u>Exhibit A</u> - Contact Us page for OnBalance website (https://www.onbalancehealth.com/contact) (last visited on May 4, 2026), which lists Bryn Mawr, PA as the contact location.

10.     Defendant OnBalance, LLC is a Delaware limited liability company that conducts business activities in Pennsylvania and sent paychecks and contracts to the Plaintiffs from 780 W Lancaster Avenue, Suite 204, Bryn Mawr, Pennsylvania.2

11.     Defendant Norley is an adult individual who, at all times relevant to this Complaint, was an officer and agent of OnBalance, upon information and belief, has a residence at 20 Matlack Lane, Villanova, Pennsylvania, as well as in Florida. According to his LinkedIn profile (https://www.linkedin.com/in/walt-norley-69720534/):

    a.     Norley is the Founder of OnBalance and has served as its Chief Executive Officer ("CEO") and managing principal since September of 2022.

    b.     Norley has also served as the Managing Partner of Granor Solutions LLC since June 2019. Granor Solutions is a Delaware limited liability company that is headquartered at 3 Radnor Corporate Center, 100 Matsonford Rd. in Radnor, Pennsylvania.

12.     Defendant Norley is a statutory employer pursuant to the definition of "employer" as set forth in Sections 148 and 149 of the Massachusetts Wage Act, Section 34:11-4.1(a) of the New Jersey Wage Payment Law and Section 2.1 of the WPCL, 43 P.S. § 260.2a, and is individually liable for the alleged wages and statutory liquidated damages due.

13.     According to OnBalance's website, in addition to Norley, OnBalance's "Leadership Team also includes (https://www.onbalancehealth.com/about):

•     Jenna Steinbrink Newman who serves as Vice President – Operations. According to her LinkedIn profile, Ms. Newman is based in the Philadelphia area, and since 2023, has also served as Senior Director - Customer Success and Director of Operations for OnBalance. *See* https://www.linkedin.com/in/jenna-steinbrink-newman/. In the past nine months, Ms. Newman led a campaign to hire a Coordinator of Customer Success for OnBalance's office in Bryn Mawr. *See* https://www.linkedin.com/jobs/view/coordinator-of-customer-success-at-onbalance-4169972225/.

---

2 See Exhibit B – Hall Paystub from OnBalance.

3

- Gene DeFilippo who serves as Athletics Business Development. According to his company bio, Mr. DeFilippo previously served as the Director of Athletics at Villanova University, among other things.

- Michael J. O'Neill who serves as University Business Development. According to his company bio, Mr. O'Neill currently also serves as the Founder and President of Beneficence, a philanthropic consulting firm located in Newtown Square, Pennsylvania. Before launching Beneficence, he served as Senior Vice President for University Advancement at Villanova University. He also serves on the Board of Trustees of La Salle Academy in Philadelphia.

14. Also according to OnBalance's website, Mike Todd serves as the company's Chief Operating Officer, and is responsible to "oversee and manage all day-to-day operational elements of the business including finance, personnel, policies, governance and company performance." https://www.onbalancehealth.com/mike-todd. Todd's profile on LinkedIn touts that he also served as OnBalance's Chief Financial Officer, and that he is based in the Greater Philadelphia, where he also is a franchise owner of Sky Zone Indoor Trampoline Park and a former Chief Financial Officer of Milestone Partners in Radnor, Pennsylvania. https://www.linkedin.com/in/mike-todd-7992571/.

15. According to OnBalance's website, its "Executive Advisory Board" includes:

- Scott Addis, who previously served as the Founder and CEO of Beyond Insurance, a business consulting firm in King of Prussia, Pennsylvania, that offers leadership training, cultural transformation, and talent and tactical development. *See* https://www.linkedin.com/in/scottaddis/.

- Rev. Robert P. Hagan, O.S.A. who previously served as the 41st Prior Provincial at the Augustinian Province of St. Thomas of Villanova, as well as the Team Chaplain of the Villanova University Men's Basketball and Football teams.

- Chris Veno, an investor and entrepreneur, located in Malvern, Pennsylvania.

- Billy King, who previously served as President and General Manager of the Philadelphia 76ers, and currently serves as the Managing Director of TurnkeyZRG and ZRG Partners, located in Haverford, Pennsylvania. *See* https://www.linkedin.com/in/billy-king-9114952a/.

4

**STATEMENT OF FACTS – GENERAL**

16.     Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

17.     Defendant OnBalance is a startup SaaS[3] business promoting its online platform designed for collegiate athletic departments and professional sports organizations to use to manage athletes' mental health.

18.     Plaintiffs Slingerland, Hall, Reese, and Gilmore all entered into contracts with OnBalance through which they became employed by Defendants and through which Defendants were obligated to timely pay them the compensation as set out in their respective contracts.

19.     Plaintiff PSC entered into a contract with OnBalance through which it provided consulting services to OnBalance and through which OnBalance was obligated to timely pay it the compensation as set out in that contract.

20.     All Plaintiffs did then perform their respective services called for under their respective contracts and were paid by OnBalance for periods of time.

21.     However, all of the Plaintiffs' contracts with OnBalance were eventually terminated and the Defendants failed to pay the Plaintiffs owed wages and/or compensation for services that Plaintiffs had provided prior to the termination of the contracts.

22.     Despite written demands by each Plaintiff for the amounts owed to them under their respective contracts, as of the filing of this complaint, Plaintiffs have never been paid their owed wages and additional compensation owed by Defendants.

23.     Defendants have not disputed that Plaintiffs Slingerland, Hall, Reese, and Gilmore are all owed unpaid wages that they earned as employees of OnBalance.

---

[3] SaaS stands for Software as a Service and is a cloud computing model where software applications are hosted by a provider and delivered to users on a subscription basis.

5

24.     Instead, Norley has confirmed to Plaintiffs Slingerland, Hall, Reese, and Gilmore that he knows that they are each owed unpaid wages that they earned as employees of OnBalance.

25.     Defendant Norley exercised operational control over the payment (or nonpayment) of the wages of Plaintiffs Slingerland, Hall, Reese, and Gilmore at OnBalance, controlled OnBalance's finances or bank accounts, had power to determine whether, when, and how employees were paid, had the power to hire and fire Plaintiffs Slingerland, Hall, Reese and Gilmore, set compensation rates or job classifications at OnBalance, supervised all of the  work of Plaintiffs' Slingerland, Hall, Reese and Gilmore, issued employment policies at OnBalance affecting pay, personally was aware of and acknowledged wages were owed to Plaintiffs but were unpaid and had day-to-day operational control and personal decision-making authority over Plaintiffs Slingerland, Hall, Reese and Gilmore and their pay.

## ADDITIONAL STATEMENT OF FACTS – SLINGERLAND

26.     Plaintiff Slingerland has worked both in marketing and sales in the sports technology and business field for many years.

27.     In July of 2024, Slingerland and OnBalance engaged in initial discussions about Slingerland becoming employed at OnBalance.

28.     At the end of that same month, Norley offered Slingerland a job to become OnBalance's Vice President of Sales.

29.     In those discussions, Norley told Slingerland that, based on OnBalance's then-existing financial records and cash balances, the company already had more than sufficient cash reserves on hand to fund at least 24-plus months of operations and expenses, including all payroll and operating costs for Slingerland, the existing employees, and all planned new hires, without the need for additional financing.

30.     Based on that representation, Slingerland agreed to quit his existing job where he had been employed for seven years, and on August 1, 2024, Plaintiff Slingerland and Defendant OnBalance entered into an employment contract (the "Slingerland Employment Agreement") under which Slingerland served as the employed Vice President of Sales for OnBalance. *See* Exhibit C – Slingerland OnBalance Employment Agreement.

31.     Norley emailed the Slingerland Employment Agreement from his OnBalance office in Bryn Mawr, Pennsylvania to Slingerland who received it at his home office in Massachusetts and signed it there.

32.     On August 19, 2025, Slingerland, who physically worked for OnBalance in Massachusetts during his entire tenure at OnBalance, started conducting OnBalance business from his OnBalance office in Boston.

33.     OnBalance provided Slingerland with a computer and technological infrastructure in Massachusetts so that he could perform his work for them in Massachusetts.

34.     The Slingerland Employment Agreement required OnBalance to pay Slingerland a base annual salary of "$200,000, paid monthly through direct deposit."

35.     The Slingerland Employment Agreement included a "Bonus/Commission" for Slingerland within its "Compensation" section that required OnBalance to "define, with the CEO, a 2025 program to attain a minimum of $100,000 in commissions through an agreed upon demo to close ratio plan."

36.     The Slingerland Employment Agreement also required Norley, OnBalance's CEO, to "provide no less than 60 days' notice to employee(s) if the business is preparing to wind down or change control through a substantial down round valuation recapitalization."

7

37.     Nothing in the Slingerland Employment Agreement made any payments to Slingerland contingent on any raising of capital by OnBalance or on any other factor other than the performance of services by Slingerland.

38.     While employed at OnBalance, Slingerland performed his duties for OnBalance almost exclusively within the Commonwealth of Massachusetts. All from Massachusetts, Slingerland coordinated on-campus and virtual meetings with college athletic directors and behavioral health directors for OnBalance, and handled all major aspects of multiple OnBalance sales including a $25,000/year deal with Liberty University and a $50,000/year deal with the University of Louisville.

39.     The Slingerland Employment Agreement references Slingerland's address in Massachusetts as did his OnBalance W-2 and all of his paychecks.4

40.     OnBalance also conducted significant business activities in Massachusetts including, obviously, the sales communications and activities which Slingerland performed in Massachusetts as described above. Slingerland conducted all of his business activities from Massachusetts, including daily company calls, weekly one on one calls with Norley, prospect demos, end-of-week activity logs submitted to Norley on Fridays (which were sent from Massachusetts and listed activities performed by Slingerland in Massachusetts), as well as all internal communications with other team members.

41.     During Slingerland's tenure, OnBalance also performed much work in Massachusetts to solicit many potential customers in Massachusetts. As part of OnBalance's business activities in Massachusetts, Slingerland coordinated on-campus meetings at Boston

---

4 *See* Exhibit D – Slingerland's OnBalance W-2.

8

College, Harvard University, Babson University, Bentley University, the University of Massachusetts at Amherst and the University of Massachusetts at Boston.

42.    During his employment at OnBalance, Norley told Slingerland that he would get 15% commissions on deals that OnBalance closed with the minimum of $100,000 in commissions as the Slingerland Employment Agreement referenced.

43.    Then, on April 21, 2025, Norley told Slingerland that OnBalance did not have the funds to keep paying his salary.  As such, Slingerland's last day of employment with OnBalance was April 25, 2025.

44.    However, OnBalance has failed and refused to pay Slingerland his salary compensation for his work at OnBalance between April 1, 2025, and April 25, 2025 which totals $13,888 in unpaid salary.

45.    On a phone call on May 7, 2025 in which Plaintiff asked Norley when he would be getting his owed April 2025 salary and commissions, Norley told Plaintiff that he would be paid his owed salary compensation and 15% commission amounts on deals that OnBalance had completed with the University of Louisville and Liberty University and 15% on any deals that he had worked on b while employed at OnBalance but that closed afterwards.  At no point did Norley deny that Plaintiff was owed his salary compensation or the commissions as described above.

46.    Norley and Slingerland continued to have follow up phone calls over the following months and not once did Norley ever deny that Plaintiff was owed his salary compensation or the commissions as described above and instead confirmed that he was owed that compensation.

47.    As of the filing of this Complaint, Slingerland has still never been paid the unpaid compensation that he has demanded of Norley, that Norley did not dispute in any way was owed to Slingerland, and that Norley instead confirmed was owed to him.

**ADDITIONAL STATEMENT OF FACTS – REESE**

48.     Plaintiff Reese has over 30 years' experience working in customer relations for multiple successful businesses as they developed their companies and brands.

49.     In 2023, Reese served as an independent consultant to OnBalance performing customer relation services, developing screening tools, and creating and documenting various processes and content.

50.     In the summer of 2023, Reese and Norley engaged in discussions about Reese becoming an accrual employee at OnBalance.  Reese was in New Jersey for and during all these discussions.

51.     In August of 2023, Norley offered Reese a job to become OnBalance's Director of Customer Success, based out of and working in New Jersey.

52.     Reese accepted and on August 24, 2023, Reese and Defendant OnBalance entered into an employment contract (the "Reese Employment Agreement") under which Reese served as the Director of Customer Success. See Exhibit E – Reese OnBalance Employment Agreement.

53.     Norley emailed the Reese Employment Agreement to Reese who received it at her home office in New Jersey and signed it there.

54.     On September 18, 2023, Reese, who physically worked for OnBalance in New Jersey during her entire tenure at OnBalance, started conducting OnBalance business from a home office in New Jersey.

55.     OnBalance provided Reese with a computer and technological infrastructure to her in New Jersey so that she could perform her work for them in New Jersey.

56.     The Reese Employment Agreement required OnBalance to pay Reese a base annual salary of "$125,000, paid monthly through direct deposit" and that this "base salary will be reviewed annually with the Company's CEO (Norley)."

57.    The Reese Employment Agreement included a "Bonus" for Reese within its "Compensation" section that required OnBalance to "pay a bonus equal to 25% of salary, based on a 95% annual subscriber rate."

58.    Nothing in the Reese Employment Agreement made any payments to Reese contingent on any raising of capital by OnBalance or on any other factor other than the performance of services by Reese.

59.    While employed at OnBalance, Reese performed her duties for OnBalance almost exclusively within the State of New Jersey. This included, but is not limited to, maintaining ongoing relationships with customers through remote communication (video conferencing, phone, email), addressing customer questions, concerns, and escalations via telephone and video calls in which Reese participated in from New Jersey, and coordinating resolutions from New Jersey with OnBalance employees.

60.    The Reese Employment Agreement references Reese's address in New Jersey as did her OnBalance W-2 and all of her paychecks.[5]  Through payments mandatory for only New Jersey employees, Reese paid premium contributions for New Jersey Unemployment Insurance, New Jersey Temporary Disability Insurance and New Jersey Family Leave Insurance, through payroll deductions processed by OnBalance.  Reese also paid required New Jersey State Income Tax on her OnBalance compensation.

61.    In October of 2024, as Reese had been employed at OnBalance for slightly over one year at that time, the annual salary review required in the Compensation section of the Reese Employment Agreement took place.  At that review, Norley, OnBalance's CEO, notified Reese that per the review, her second year OnBalance salary was to increase by 15%.  That 15% increase

---

[5] *See* <u>Exhibit F</u> – Reese's OnBalance W-2 and examplar Paycheck.

raised the salary that she was earning per the Reese Employment Agreement, as of her one-year mark, September 18, 2024, to $143,750.

62.    When her next paychecks did not reflect her salary increase, Reese spoke with OnBalance's Director of Operations, Jenna Steinbrink, and was told that she would, in fact, see the increase in her November 2024 paycheck which would come at or around December 1, 2024.

63.    However, OnBalance never paid the required and contractually agreed to increased salary amount at any time during Reese's employment at OnBalance.

64.    When Reese complained to Norley about not being paid what they were contractually owed by OnBalance, Norley told her that she should be thankful that she was getting paid at all.

65.    Then, on April 14, 2025, Norley told Reese that OnBalance was "letting her go" as of April 30, 2025 not due to performance but due to company finances.  Norley offered to pay her $60 an hour as a contract consultant and said that he would be in touch with her about the same.

66.    As such, Reese's last day of employment with OnBalance was April 30, 2025.  See Exhibit G – Norley April 30, 2025 Termination Email to Reese.

67.    During Reese's employment at OnBalance, OnBalance had entered into signed contracts with two customers, both of which renewed their contracts.  As such, there was a 100% subscriber rate, so Reese was due a "bonus equal to 25% of her salary," that OnBalance was required to pay her per the Reese Employment Agreement, because there was a 100% subscriber rate.

68.    However, OnBalance never paid her the bonus that she was owed per the requirements of the Reese Employment Agreement.

12

69.     Further, OnBalance has failed and refused to pay Reese her salary compensation for her work at OnBalance between April 1, 2025, and April 30, 2025 which totals $10,416.67 in unpaid salary (not including the never-paid 15% increase).

70.     OnBalance has failed and refused to pay Reese her 15% salary increased compensation for her work at OnBalance between September 18, 2024, and April 30, 2025 which totals $11,562.46 in the unpaid 15% increase portion of her salary compensation.

71.     OnBalance has failed and refused to pay Reese the "bonus equal to 25% of salary, based on a 95% annual subscriber rate" that it was required to pay her per the Employment Agreement when there was a 100% annual subscriber rate.  As 25% of her initial $125,000 salary is $31,250, she should have been paid that bonus at the end of the first year of her Reese Employment Agreement but was not.

72.     As such, OnBalance has failed and refused to pay Reese a total of $53,229.13 in unpaid compensation.

73.     On May 1, 2025, Reese emailed Norley about her unpaid compensation and Norley responded, also on May 1, 2025 with an email that said that her "payment should be distributed Monday."

74.     However, that was untrue as no payment was ever made to Reese.

75.     Reese tried to call Norley about her unpaid compensation, but Norley never answered the phone or returned her calls in response to her voicemails asking him to do so.

76.     As of the filing of this Complaint, Reese has still never been paid the unpaid compensation that she has demanded of Norley, that Norley did not dispute in any way was owed to Reese.

13

**ADDITIONAL STATEMENT OF FACTS – HALL**

77.    Plaintiff Hall is a longtime product developer in the technical fields of computer science, including AI.

78.    In July of 2024, Hall and OnBalance engaged in initial discussions about Hall becoming employed at OnBalance.

79.    On August 9, 2024 Norley called Hall from Pennsylvania and officially offered Hall the position of OnBalance's Vice President of Product Development & Management.

80.    During that call, in order to decide whether to quit his existing job and take Norley's offer to become employed at OnBalance, because OnBalance was a startup, Hall asked Norley about OnBalance's available capital and ability to pay its expenses in the future, including his agreed-upon salary. In that call, Norley told Hall that OnBalance already had the money in place to pay Hall's salary for at least two-plus years, regardless of future sales, business or additional financing, because based on OnBalance's then-existing financial records and cash balances, the company already had more than sufficient cash reserves on hand to fund at least 24-plus months of operations and expenses, including all payroll and operating costs for Hall, the existing employees, and all planned new hires, without the need for any additional financing.

81.    Based on that representation, Hall agreed to quit his existing job and on August 11, 2024, Plaintiff Hall signed the employment contract (the "Hall Employment Agreement") that Norley had emailed to him from his OnBalance office in Pennsylvania.  See Exhibit H – Hall's Employment Agreement with OnBalance.

82.    Shortly thereafter, Hall went to his dedicated office inside OnBalance's Pennsylvania office location and started conducting OnBalance business from that Pennsylvania office.

14

83. On August 27, 2024, in an OnBalance meeting in Pennsylvania, Norley reiterated to Hall that OnBalance already had the money in place to keep him employed there for at least two-plus years, regardless of future sales, business or additional financing. Norley represented that based on OnBalance's then-existing finances and cash balances, the company already had more than sufficient cash reserves on hand to fund well over two years of operations and expenses, including all payroll and operating costs for Hall, the existing employees, and all planned new hires.

84. The Hall Employment Agreement required OnBalance to pay Hall a base annual salary of "$175,000, paid monthly through direct deposit" and "an annual bonus based on achieving defined goals with CEO."

85. Nothing in the Hall Employment Agreement made any payments to Hall contingent on any raising of capital by OnBalance or on any other factor other than the performance of services by Hall.

86. OnBalance also assumed responsibility in writing for withholding and timely remitting Hall's child support payments to the State of Florida out of his pay, which OnBalance initially did.

87. During Hall's tenure, Hall worked onsite from OnBalance's offices in Pennsylvania, where Hall maintained an office. Hall also worked remotely and at other OnBalance locations at times.

88. During Hall's tenure, Hall, Norley, and OnBalance conducted significant business activities in and from Pennsylvania. For example, OnBalance's Chief Operating Officer, Mike Todd, sent OnBalance contracts from his Pennsylvania office to OnBalance customers for their execution.

15

89.     Hall performed the following types of work activities while employed at OnBalance, all while working onsite for OnBalance in Pennsylvania: sent and received work emails in furtherance of performing OnBalance job duties; drafted, reviewed, and edited OnBalance documents; reviewed UniData Lab vendor agreements and legal documents; sent out and received work communications through Slack, Teams, WhatsApp, and SMS messaging; logged into company systems (email, Azure, Jira, GitHub, SharePoint, DROPBOX); accessed Azure cloud platforms, dashboards, or admin panels; made and received work telephone calls; participated in live and virtual meetings with other OnBalance employees; participated in customer and vendor calls; mailed and received mailings in furtherance of performing OnBalance job duties to and from Pennsylvania; signed documents on behalf of OnBalance; communicated with OnBalance customers such as Wake Forest University; met and communicated with OnBalance board members; conducted customer support and client service activities; participated in sales discussions; negotiated terms with OnBalance vendors such as UniData Labs; supervised, managed, or directed work of the OnBalance employees and UniData Lab; wrote, edited, or reviewed computer code; reviewed logs, metrics, and system alerts; designed workflows and technical documentation; tested software and reviewed test results; prepared AI-Roadmaps, pitch materials, decks, and written summaries; and conducted market and competitive analysis.

90.     Problems began in April of 2025, when OnBalance started paying Hall his salary payments later than they were due under the Hall Employment Agreement and/or only made partial salary payments.

91.     To try to make up for that, on June 18, 2025, Norley sent Hall an email stating that "in consideration for your patience with payroll timing" Hall would receive a "15% bonus on the months there has been a delay in payroll when 50% of the Series B has been raised."

16

92.     On or about July 10, 2025, Norley told Hall that Hall would be paid and that payroll was covered through the year because "(t)he OnBalance board of directors has each written me [Norley] $250,000 checks" and that Norley "was on his way to the bank to deposit the checks and cut payroll checks and get [Hall] caught-up on his pay." Hall relied on that representation, and based on that representation, Hall continued working for OnBalance.

93.     However, at the beginning of August of 2025, OnBalance failed to timely pay Hall his full salary for July of 2025.

94.     Hall would have quit OnBalance at that time, but on or about August 11, 2025, Norley told Hall that Hall would get paid the arrearage owed very soon as there was "great news" in that "the Series B investors have signed their paperwork, and I [Norley] am just waiting for investment checks to clear."

95.     However, Norley's representations turned out not to be true, and Hall continued not to get timely and fully paid his initial salary or the 15% bonus that Norley had promised to pay Hall.

96.     On November 17, 2025, Hall emailed Norley making a demand for the immediate payment of all of his unpaid wages from April of 2025 to that point, which was $43,334, in addition to the 15% bonus necessitated by the delay in payroll as Norley had promised but failed to pay.

97.     In response to Hall's November 17, 2025, 7:50 am, emailed written demand for these payments to Norley, Norley emailed Hall a response 18 minutes later in which he did not dispute any of the amounts due and owing, instead responding:

> "Eric,
>
> As we discussed last week, I appreciate your patience and commitment to the mission. We expect an international wire to hit today, and if so you will be sent $14,583 immediately.

I cannot commit at this time. Traveling to Phila[6] this week for a series of prospective investor meetings and pushing hard with Mike O'Neill to get some investment runway. I completely understand if you need to move on. Please let me know if you want to discuss by phone this morning.

Walt"

Norley followed that with another responsive email minutes later that said:

"I meant to say, I cannot commit to the timing of the remainder of the salary arrears at the moment."

*See* <u>Exhibit I</u> - Norley - Hall November 17, 2025, Email Chain.

98.    Norley also texted Hall that day stating that given the non-payment of owed compensation as set out in Hall's email, "I understand if you need to explore other opportunities."

99.    Left with no reasonable alternative, Hall ceased working for OnBalance on or about November 17, 2025.

100.    Curiously, during 2025 when Norley and OnBalance continued to withhold Hall's outstanding wages owed, Defendants were hosting a podcast, titled "Athletes OnBalance" (the "Podcast"), which included celebrity sports figures such as:

- Jay Wright, the legendary Coach for Villanova University's Men's Basketball Team, who built Villanova basketball into a national powerhouse over 21 seasons with two NCAA championships, four Final Four appearances, and over 500 wins, appeared on Defendants' Podcast in November 2025 (42 minutes).

- Chris Casola, the Senior Associate Athletic Director for Champion Performance at Liberty University, which is touted as one of the premier sports science programs in the NCAA through a partnership with Royer Neuroscience, appeared on Defendants' Podcast in October 2025 (lasting over 33 minutes).

- Nick Saban, the legendary football coach, whose many accomplishments include six national championships and nine SEC titles while coaching at the University of Alabama; he was elected to the College Football Hall of Fame in 2025; and he currently serves an analyst for ESPN's College GameDay as well as appearing in popular commercials for Aflac insurance and Vrbo vacations rentals. Coach Saban,

---

[6] "Phila" being Philadelphia, Pennsylvania where Norley and OnBalance were conducting business and "pushing hard" for business.

along with former NCAA Chief Medical Officer Dr. Brian Hainline, appeared on Defendants' Podcast in June 2025 (45 minutes).

It is unknown whether those podcasts, and other such marketing pieces, were paid appearances, and if so, the terms of those appearances. Numerous others have likewise appeared on Defendants' Podcast as part of Defendants' online marketing campaign, *see* https://www.onbalancehealth.com/podcast.

101. As of the filing of this complaint, Hall has still never been paid the unpaid wages owed and additional compensation promised by Defendants, and Defendants have not disputed as much.

102. To make matters worse, on or about December 31, 2025, Hall learned from the Florida Department of Highway Safety and Motor Vehicles that while he was employed at OnBalance, OnBalance had not, in fact, submitted all of the child support payments that it was obligated to make to the State of Florida as scheduled. As a result of Defendants' breaches and misrepresentations, Hall's driver's license was suspended and his credit was harmed, resulting in financial losses and other damages.

**ADDITIONAL STATEMENT OF FACTS – GILMORE AND PSC**

103. Plaintiff Gilmore is a nationally recognized mental health expert with a doctorate degree in behavioral health who in 2022 was employed by the University of Alabama as an Assistant Athletic Director of Behavioral Health and Wellness.

104. Gilmore is also the sole owner and member of Plaintiff Post-Season Consulting, LLC.

105. On October 1, 2022, Plaintiff PSC and Defendant OnBalance executed and entered into a Consultant and Non-Disclosure Agreement (the "PSC Consultant Agreement"). As the name implies, the PSC Consultant Agreement called for PSC to provide consulting services to

19

OnBalance in return for compensation.  Plaintiff Gilmore, as the sole owner and employee of PSC, provided all of PSC's services to OnBalance under the PSC Consultant Agreement.

106. The PSC Consultant Agreement required OnBalance to pay PSC a monthly fee of $5,000.00 per month from October 1, 2022 through December 31, 2022 and $12,000 per month from January 1, 2023 to December 31, 2023. The term of the PSC Consultant Agreement then automatically renewed absent written notice otherwise, which did not occur until the signing of Plaintiff Gilmore's Employment Agreement in November of 2024.

107. PSC performed all required consulting services under the PSC Consultant Agreement from its inception in October of 2022 through November of 2024.

108. OnBalance paid the required monthly amounts from October 2022 through May of 2023, with the exception of the $12,000 April 2023 payment which was not paid.

109. In the Spring of 2023, an administrative official at the University of Alabama ("UA"), Gilmore's employer at the time, expressed some concern about OnBalance[7].  Gilmore relayed this to Norley, who told Gilmore that could be avoided and that he would put the remaining PSC consulting payments, as well as the unpaid April 2023 payment, each month in an escrow account that he would open and maintain for PSC.

110. PSC then continued to provide OnBalance with all of the consulting services called for under the PSC Consultant Agreement through November of 2024.

111. During those months, Norley told Gilmore that he had, in fact, put the PSC consulting payments each month in (per Norley's words) "the escrow account" that he opened and maintained for the benefit of PSC, and that he could and would authorize and facilitate payment of the funds to her out of that escrow account at her request.

---

[7] Dr. Gilmore's supervisor at UA had already specifically approved in writing of the PSC Consultant Agreement and the payments to PSC.

112. During 2024, Norley talked multiple times with Gilmore about OnBalance about changing from a contract consultant to an OnBalance employee. Norley made multiple representations to Gilmore during 2024 about existing and pending investment capital and business for OnBalance and assured her that she would be a big part of the very bright future of OnBalance.

113. During 2024, whenever Gilmore asked for the PSC consulting payments that Norley had in the escrow account to be paid to PSC, Norley told her that he would get those paid out of the escrow account to PSC "soon" but that never materialized. Gilmore did not press the issue at that time because she did not want to alienate Norley and miss out on the future opportunities with OnBalance that Norley told her were in her future. Further, based on Norley's representations, she believed those funds to be earning interest for PSC in the escrow account.

114. In early November of 2024, Norley offered Gilmore full time employment at OnBalance as its Chief Mental Health Officer. In the meetings between Gilmore and Norley discussing the job offer, Gilmore again asked Norley to authorize and facilitate OnBalance to go ahead and pay PSC the owed monies from the Consultant Agreement out of the escrow account so that she would be starting employment at OnBalance with a clean slate.

115. Norley agreed to that and said that he would do so but that Gilmore should discuss the logistics of that payment out of the escrow account as well as the details of her employment compensation with OnBalance with Mike Todd, OnBalance's Chief Financial Officer at that time.

116. On or about November 4, 2024, Gilmore and Mr. Todd discussed and reached agreement on her future employment compensation with OnBalance. In those discussions, Gilmore also told Mr. Todd that Norley had told her to talk to him about the logistics of OnBalance paying PSC's owed monies from the Consultant Agreement out of the escrow account.

21

117.    Mr. Todd wanted to negotiate the PSC amount owed.  Since Gilmore was going to be getting a good salary and other compensation as set out in an employment contract with OnBalance and based on the representations of Norley as to OnBalance's capital and business situation which would provide much financial benefit to her in the future, she, on behalf of PSC, agreed to the concept of a reduced amount owed only if it was paid quickly out of the escrow account.  Mr. Todd agreed that a significant but reduced amount (that never got finalized) would be paid in two equal payments, one in 30 days from that date and the second half paid in 90 days from that date.

118.    Based on all of the foregoing representations by Norley and OnBalance, including, but not limited to, the ones regarding the PSC money in the escrow account that was going to be quickly paid out of the escrow account, Gilmore resigned her long tenured position at the University of Alabama, and on November 6, 2024, Plaintiff Gilmore and Defendant OnBalance entered into an employment contract (the "Gilmore Employment Agreement") under which Dr. Gilmore served as the employed Chief Mental Health Officer for OnBalance. See Exhibit J – Gilmore OnBalance Employment Agreement.

119.    The Gilmore Employment Agreement required OnBalance to pay Dr. Gilmore a base annual salary of $200,000, paid monthly to her through direct deposit into her bank account and a bonus of "25% of salary, based on quantitative metrics in customer success."

120.    The Gilmore Employment Agreement also required OnBalance to pay and/or reimburse Dr. Gilmore for certain business expenses that she incurred in her employment at OnBalance.

121. Nothing in either the PSC Consultant Agreement or the Gilmore Employment Agreement made any payments to PSC or Gilmore contingent on any raising of capital by OnBalance or on any other factor other than the performance of services by PSC and Gilmore.

122. Problems began almost immediately when OnBalance did not, in fact, pay PSC any of the owed monies from the PSC Consultant Agreement out of any escrow account or otherwise, at 30 days or 90 days or at any time.

123. Every time that Gilmore raised that issue with Norley, who now had much more leverage over her since she had resigned her job at UA and was totally dependent on him and OnBalance for her livelihood, he said that she was not worth the money that OnBalance was paying her in employment compensation, much less any other money.

124. As such, as of the date of this complaint, OnBalance has still failed and refused to pay PSC for months of unpaid consulting services that were rendered to it under the PSC Consultant Agreement.

125. Further, early in 2025, OnBalance started paying Gilmore her salary payments later than they were due under the Gilmore Employment Agreement.

126. To try to make up for that, on June 30, 2025, Norley sent Gilmore an email stating that "in consideration for your patience with payroll timing" she would receive a "15% bonus on the months in which there has been a delay in payroll when 50% of the Series B has been raised."

127. However, like in previous months, July's salary payment was also late.

128. Then, OnBalance failed to pay Gilmore her salary for some months at all.

129. OnBalance also failed to reimburse Gilmore for $1,786.14 in expenses.

130. As a result of not being paid for her employment, Gilmore resigned her employment at OnBalance on October 9, 2025.

131.    As such, in 2025, during the term of the Gilmore Employment Agreement that required OnBalance to pay Gilmore $16,666.67 a month, Gilmore worked from January 1, 2025, until October 8, 2025 and thus should have been paid $154,301.11 in salary.  However, as shown by her 2025 W-2, she was only paid $116,666.69 and thus was underpaid $37,634.42, which is equivalent to 2.25 months of unpaid wages.

132.    As of the filing of this complaint, despite making written demands to Norley and OnBalance for payment, Gilmore has still never been paid her that unpaid salary amount.

133.    As of the filing of this complaint, despite making written demands to Norley and OnBalance for payment, OnBalance has not paid or reimbursed her for the owed $1,786.14 in business expenses.

134.    As of the filing of this complaint, despite making written demands to Norley and OnBalance for payment, Gilmore has still never been paid the 15% bonus/late fee per Norley's email on the late salary payments in 2025.

135.    After Gilmore made a written demand for these payments in her resignation email, on October 10, 2025 Norley emailed Gilmore a response in which he did not dispute any of the amounts due and owing, instead responding "(w)e will be in communications as the capital raise continues and ultimately closes to arrange payments for arrears and expenses." *See* Exhibit K - Norley October 10, 2025 Email Response to Gilmore Demand for Payment of Salary, etc.

136.    However, since that date, neither Norley nor OnBalance has communicated with Gilmore about the non-payment of her earned compensation or her expense reimbursement, and certainly has not paid her any of the amounts that she is owed.

24

137. While Gilmore was employed at OnBalance, per her Gilmore Employment Contract, OnBalance was required to "pay 100% of (her) Health and Dental (insurance) premiums" throughout her employment.

138. However, that did not occur as on multiple occasions Gilmore was denied health care as her medical providers informed her, while she was at their offices to get medical care, that her OnBalance health insurance had lapsed due to non-payment of premiums.

139. On November 13, 2025, Gilmore had legal counsel that she retained send a letter to Norley and OnBalance referencing the end of all relationships between Gilmore and OnBalance and making another demand for payment for Gilmore and PSC, as well as notifying OnBalance and Norley that legal action would follow if such payments were not made.

140. After the end of the contract and relationship between PSC and OnBalance, after the end of the employment relationship between Gilmore and OnBalance, and even after legal counsel made demand upon OnBalance and Norley on their behalf, OnBalance has continued, as of January of 2026, to feature Dr. Gilmore's name, image and likeness on OnBalance's website. From her resignation on October 9, 2025, to January 2, 2026, OnBalance's website still listed Plaintiff as its Chief Mental Health Officer. As of January 31, 2026, the site included quotes from her, and used her name, picture and professional stature to market OnBalance, without her permission and for no compensation.

141. Upon information and belief, after the end of the contract and relationship between PSC and OnBalance, after the end of the employment relationship between Gilmore and OnBalance, and even after legal counsel made demand upon OnBalance and Norley on their behalf, Gilmore's name has been used by Defendants in various marketing and promotional mediums, for branding purposes and in the attempted raising of capital from potential investors.

25

142.    Defendants never sought permission or authority to continue to use Gilmore's name, image, likeness and association to advertise, promote, market or endorse OnBalance beyond the end of her contractual relationship with OnBalance.

143.    Gilmore never gave permission, or assigned, licensed or otherwise consented to Defendants using her name, image, likeness and association to advertise, promote, market or endorse OnBalance beyond the end of her contractual relationship with OnBalance.

144.    That name, image, likeness and association was specifically included in the PSC Consultant Agreement and Gilmore Employment Contract as items of value that PSC and Gilmore were providing in return for (what turned out to be unpaid) compensation.

145.    However, Defendants have used and are using it beyond the end of those contracts without compensating Gilmore for it.

146.    Defendants' continued use of Gilmore's name, image, likeness and association in connection with OnBalance even after Defendants have refused to pay her, ignored her and without her knowledge as to how they are being used as she is no longer emp.

## CLAIMS FOR RELIEF

### Count I - Breach of Contract - Employment Agreements

**(Plaintiffs Slingerland, Reese, Hall, and Gilmore
Against Defendant OnBalance)**

147.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

148.    On the dates as set forth above, Plaintiffs Slingerland, Reese, Hall and Gilmore entered into employment contracts with OnBalance under which Plaintiffs Slingerland, Reese, Hall, and Gilmore became employed by Defendants, performed employee services and earned compensation and wages.

26

149. Plaintiffs Slingerland, Reese, Hall, and Gilmore performed all duties required under their employment contracts until those agreements ended.

150. However, OnBalance breached those contracts by failing to perform its obligations under the Employment Agreement by not paying Plaintiffs Slingerland, Reese, Hall, and Gilmore their earned compensation and wages as described in this Complaint.

151. In addition to breaching Plaintiffs' contracts, OnBalance has also breached the convenant of good faith and fair dealing.

152. As described above, OnBalance has failed to pay Slingerland $13,888 in unpaid salary in addition to unpaid commissions in the estimated amount of $11,250 (subject to precise calculation in discovery).

153. OnBalance, through Norley, has confirmed to Slingerland that he is owed unpaid wages due to him under his employment contract but has still failed to pay them.

154. As described above, OnBalance has failed and refused to pay Reese a total of $53,229.13 in unpaid compensation.

155. OnBalance, through Norley, has confirmed to Reese that she is owed those wages.

156. Hall performed all duties required under the Hall Employment Agreement, which required OnBalance to pay Hall a base annual salary of "$175,000, paid monthly through direct deposit" and "an annual bonus based on achieving defined goals with CEO," from August 13, 2024 through November 17, 2025.

157. However, OnBalance has failed to pay Hall's wages from April of 2025 to November 17, 2025, that he earned per that contract.

158. As such, OnBalance has failed to pay Hall $43,334, the 15% late payment bonus per Norley's June 18, 2025, email, and any bonus due under the Employment Agreement.

27

159. After Hall made a written demand for these payments in his November 17, 2025 email, Norley, on behalf of OnBalance, did not dispute any of the amounts due and owing, instead responding "I appreciate your patience and commitment to the mission" and "I cannot commit to the timing of the remainder of the salary arrears at the moment."

160. Nonetheless, OnBalance has still failed to pay Hall the aforementioned payments due and owing him under the Hall Employment Contract and Norley's June 18, 2025, email.

161. Further, by OnBalance not meeting its contractual obligations to timely submit all of the child support payments that it was obligated to make to the State of Florida as scheduled, Hall's driver's license was suspended, his credit was harmed, and he suffered additional related damages.

162. The Gilmore Employment Agreement required OnBalance to pay Gilmore a base annual salary of $200,000, paid monthly to her through direct deposit into her bank account, a bonus of "25% of salary, based on quantitative metrics in customer success," 100% of (her) Health and Dental (insurance) premiums" throughout her employment and to pay and/or reimburse Gilmore for certain business expenses that she incurred in her employment at OnBalance.

163. Gilmore performed all duties required under the Gilmore Employment Agreement from December 1, 2024 through October 8, 2025.

164. However, OnBalance breached that contract by failing to pay Gilmore the full $154,301.11 in salary that she earned under the Employment Agreement for the time that she worked in 2025. Instead, as shown by her 2025 W-2, she was only paid $116,666.69 and thus was underpaid $37,634.42, which is equivalent to 2.25 months of unpaid wages.

28

165. OnBalance has failed to pay Gilmore the 15% late payroll adjustment for the failure to pay April, May, June, July, August, September, and October 2025 in a timely manner, for a total of late fees due in the amount of $15,645.26.

166. Gilmore incurred business expenses while traveling for OnBalance totaling $1,786.14.

167. After Gilmore made a written demand for these payments in her resignation email, on October 10, 2025 Norley emailed Gilmore a response in which he did not dispute any of the amounts due and owing, instead responding "(w)e will be in communications as the capital raise continues and ultimately closes to arrange payments for arrears and expenses."

168. Nonetheless, OnBalance has still failed to pay Gilmore the aforementioned payments due and owing her under the Employment Contract and Norley's June 30, 2025, email.

WHEREFORE, Plaintiffs Slingerland, Reese, Hall, and Gilmore demand judgment against Defendant OnBalance in a sum to be determined by the trier of fact plus interest and costs.

### Count II - Breach of Contract – PSC Consultant Agreement

**(Plaintiff PSC against Defendant OnBalance)**

169. Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

170. On October 1, 2022, PSC and OnBalance entered into the PSC Consultant Agreement which was a valid and enforceable contract.

171. The Consultant Agreement required OnBalance to pay PSC a monthly fee of $5,000.00 per month from October 1, 2022 through December 31, 2022 and $12,000 per month from January 1, 2023 to December 31, 2023. The term of the PSC Consultant Agreement then automatically renewed absent written notice otherwise, which did not occur until the signing of Plaintiff Gilmore's Employment Agreement in November of 2024.

172. PSC performed all required consulting services under the PSC Consultant Agreement from its inception in October of 2022 through November of 2024.

173. However, OnBalance only paid the required monthly amounts from October 2022 through May of 2023, with the exception of the $12,000 April 2023 payment which was not paid.

174. Defendants OnBalance and Norley have acknowledged and agreed that OnBalance failed to pay PSC for months of consulting services that were rendered by PSC.

175. OnBalance has still failed and refused to pay PSC for the months of unpaid consulting services that were rendered to it under the PSC Consultant Agreement and thus owes PSC, those consulting fees plus interest, for those unpaid months.

176. In addition to breaching the contract with PSC, OnBalance has also breached the covenant of good faith and fair dealing.

WHEREFORE, Plaintiff PSC demands judgment against Defendant OnBalance in a sum to be determined by the trier of fact plus interest and costs.

## Count III - Unjust Enrichment

### (All Plaintiffs against Defendants)

177. All previous factual averments are incorporated as though fully set forth herein.

178. Plaintiffs claim that the Defendants have unjustly enriched themselves to the detriment of the Plaintiffs. [With regard to Defendant OnBalance only, this claim is pleaded as an alternative cause of action to the Plaintiffs' breach of contract claims.]

179. The Defendants have received and benefited from the uncompensated labor of the Plaintiffs, such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

180. Indeed, throughout its existence, OnBalance has been controlled by Norley and has operated as an alter ego of Norley.

181.    At all relevant times hereto, the Defendants devised and implemented a plan to increase their earnings and profits by fostering a scheme of securing work from the Plaintiffs without paying any compensation for all workweeks worked.

182.    Contrary to all good faith and fair dealing, the Defendants induced the Plaintiffs to perform work in workweeks while failing to pay compensation owed for the same.

183.    By reason of having secured the work and efforts of the Plaintiffs without paying the appropriate compensation, the Defendants enjoyed reduced overhead with respect to their labor costs and therefore realized additional earnings and profits to their own benefit and to the detriment of the Plaintiffs. The Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

184.    Accordingly, the Plaintiffs are entitled to judgment in an amount equal to the benefits unjustly retained by Defendants.

WHEREFORE, Plaintiffs demand judgment against Defendants in a sum to be determined by the trier of fact plus interest and costs.

### Count IV –Violation of the Massachusetts Wage Act
### (Plaintiff Slingerland against Defendants)

185.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

186.    The Massachusetts Wage Act (the "Wage Act") states that "in no event shall wages remain unpaid by an employer (of a salaried employee) for more than six days from the termination of the pay period in which such wages were earned by the employee." Mass. Gen. Laws Ann. ch. § 148.

187.    The Wage Act applies to highly compensated employees, including executives, and does not exclude them based on their earnings.  See Mass. Gen. Laws Ann. ch. 149, §§ 148–150.

31

188.    The Wage Act also states that employers who violate the Wage Act are strictly liable. Also, successful employees are entitled to a mandatory award of treble damages, as liquidated damages, for any lost wages and other benefits. See Mass. Gen. Laws Ann. ch. 149, § 150.

189.    Defendants were contractually obligated to pay Plaintiff Slingerland for all agreed upon compensation, including commissions, for all workweeks that he worked.

190.    As a result of the facts and violations described above in the Statement of Facts, Defendants failed to pay Plaintiff Slingerland his earned compensation, including commissions, for all workweeks that he worked.

191.    OnBalance has failed to pay $13,888 in unpaid salary in addition to unpaid commissions in the estimated amount of $11,250 (subject to precise calculation in discovery).

192.    Defendants' conduct and practices, described herein, were willful, intentional, unreasonable, arbitrary, and in bad faith.

193.    The Wage Act explicitly provides that the owners and officers of a corporate entity, as well as any officers or agents "having the management of such corporation," are deemed to be employers and are personally and individually liable for violations of the Wage Act.  Mass. Gen. Laws Ann. ch. 149, § 148.

194.    Defendant Norley exercised operational control over the payment (or nonpayment) of Plaintiff Slingerland's wages at OnBalance, controlled OnBalance's finances or bank accounts, had power to determine whether, when, and how employees were paid, had the power to hire and fire Plaintiff Slingerland, set compensation rates or job classifications at OnBalance, supervised Plaintiff Slingerland's work, issued employment policies at OnBalance affecting pay, personally was aware of and acknowledged wages were owed to Plaintiff Slingerland but were unpaid and

32

had day-to-day operational control and personal decision-making authority over Plaintiff Slingerland and his pay.

195.    As a result of Defendants' conduct described above in the Statement of Facts, Plaintiff Slingerland was illegally deprived of compensation earned, in such amounts to be determined at trial, and is entitled to recovery of such total unpaid amount, treble liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, costs and other compensation pursuant to Wage Act.

WHEREFORE, Plaintiff Slingerland demands judgment against Defendants in a sum to be determined by the trier of fact and the Court including all damages as set out above.

### Count V –Violation of the Pennsylvania Wage Payment and Collection Law
### (Plaintiff Hall against Defendants)

196.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

197.    The WPCL requires every employer to "pay all wages, other than fringe benefits and wage supplements, due to his employees on regular paydays designated in advance by the employer." 43 Pa. Stat. Ann. § 260.3(a).

198.    Defendants were contractually obligated to pay Plaintiff Hall for all workweeks that he worked.

199.    As a result of the facts and violations described above in the Statement of Facts, Defendants failed to pay Plaintiff Hall for all workweeks that he worked.

200.    Defendants' conduct and practices, described herein, were willful, intentional, unreasonable, arbitrary, and in bad faith.

201.    These wages have remained unpaid for more than 30 days beyond Plaintiff Hall's regular paydays without the existence of any good-faith contest or dispute that they are due and

owing to Plaintiff Hall. Therefore, Defendants are additionally liable to Plaintiff Hall for statutory liquidated damages.

202.   Defendant Norley exercised operational control over the payment (or nonpayment) of Plaintiff Hall's wages at OnBalance, controlled OnBalance's finances or bank accounts, had power to determine whether, when, and how employees were paid, had the power to hire and fire Plaintiff Hall, set compensation rates or job classifications at OnBalance, supervised Plaintiff Hall's work, issued employment policies at OnBalance affecting pay, personally was aware of and acknowledged wages were owed to Plaintiff Hall but were unpaid and had day-to-day operational control and personal decision-making authority over Plaintiff Hall and his pay.

203.   As a result of Defendants' conduct described above in the Statement of Facts, Plaintiff Hall was illegally deprived of compensation earned, in such amounts to be determined at trial, and is entitled to recovery of such total unpaid amount, liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, costs and other compensation pursuant to WPCL.

WHEREFORE, Plaintiff Hall demands judgment against Defendants in a sum to be determined by the trier of fact and the Court including all damages as set out above.

## Count VI – Violation of the New Jersey Wage Payment Law
### (Plaintiff Reese against Defendants)

204.   Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

205.   The New Jersey Wage Payment Law (the "WPL") states that upon the termination of an employee's employment, full wages are to be paid "not later than the regular payday for the pay period during which the employee's termination, suspension or cessation of employment . . . took place[.]" N.J.S. § 34:11-4.3.

206. The WPL applies to all employees, including highly compensated salaried employees, and does not exclude them based on their earnings.

207. The WPL also states that employers who violate the WPL are strictly liable. Also, successful employees are entitled to an award of 200% of unpaid wages as liquidated damages, and attorneys' fees and costs. *See* N.J. Stat. § 34:11-4.10

208. Defendants were contractually obligated to pay Plaintiff Reese for all agreed upon compensation, including commissions, for all workweeks that she worked.

209. As a result of the facts and violations described above in the Statement of Facts, Defendants failed to pay Plaintiff Reese her earned compensation for all workweeks that she worked.

210. Defendants' conduct and practices, described herein, were willful, intentional, unreasonable, arbitrary, and in bad faith.

211. The WPL explicitly provides that the owners and officers of a corporate entity, as well as any officers or agents "having the management of such corporation," are deemed to be employers and are personally and individually liable for violations of the WPL.  N.J.S. § 34:11-4.1(a).

212. Defendant Norley exercised operational control over the payment (or nonpayment) of Plaintiff Reese's wages at OnBalance, controlled OnBalance's finances or bank accounts, had power to determine whether, when, and how employees were paid, had the power to hire and fire Plaintiff Reese, set compensation rates or job classifications at OnBalance, supervised Plaintiff Reese's work, issued employment policies at OnBalance affecting pay, personally was aware of and acknowledged wages were owed to Plaintiff Reese but were unpaid and had day-to-day operational control and personal decision-making authority over Plaintiff Reese and her pay.

35

213. As a result of Defendants' conduct described above in the Statement of Facts, Plaintiff Reese was illegally deprived of compensation earned, in such amounts to be determined at trial, and is entitled to recovery of such total unpaid amount, liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, costs and other compensation pursuant to WPL.

WHEREFORE, Plaintiff Reese demands judgment against Defendants in a sum to be determined by the trier of fact and the Court including all damages as set out above.

### Count VII - Violation of the Lanham Act, 15 U.S.C. § 1125(a), for False Advertising and False Endorsement

**(Plaintiff Gilmore against Defendants)**

214. Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

215. Section 43 of the Lanham Act, 15 U.S.C. § 1125, *et seq.* applies to Defendants and protects Plaintiff Gilmore from the conduct described herein. Specifically, the Lanham Act prohibits a party in commercial advertising and promotion from "misrepresent[ing] the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services or commercial activities . . . ." 15 U.S.C. §1125(a)(1)(B).

216. The Lanham Act also prohibits a party in commercial advertising and promotion from committing any act that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person . . . or approval of his or her goods, services, or commercial activities by another person" 15 U.S.C. §1125(a)(1)(A).

217. Defendants used Plaintiff Gilmore's name, image, likeness, and association as described herein without authority in order to create the perception that Gilmore still works at or is otherwise still affiliated with OnBalance, still endorses Defendants' businesses and activities,

and/or still consented to or authorized Defendants to continue to use her name, image, likeness, and association in order to advertise, promote, and market Defendants' businesses and activities.

218. Defendants' continued use of Gilmore's name, image, likeness, and association to advertise, promote and market Defendants' businesses and activities as described in this Complaint was false and misleading.

219. Despite the fact that Defendants were, at all times, aware that Gilmore did not still work at, nor endorse OnBalance, Defendants nevertheless used Gilmore's name, image, likeness, and association to mislead potential customers or investors as to Gilmore's status with OnBalance.

220. As a direct and proximate result of Defendants' actions as described earlier in this Complaint, after leaving OnBalance, Gilmore has no control over the nature and quality of the services provided by OnBalance or the nature of the Defendants' depictions of Gilmore's name, image, likeness, and association.

221. Defendants' false advertising described above has the capacity or tendency to confuse actual and prospective customers or investors of OnBalance as to whether Gilmore still works at or is otherwise affiliated with OnBalance, still endorses Defendants' businesses and activities, and/or consented to or authorized Defendants to use her name, image, likeness, and association in order to advertise, promote, and market Defendants' businesses and activities.

222. Defendants' advertisements, promotions, and marketing of OnBalance occur in and are targeted to interstate commerce, through their website.

223. Defendants' unauthorized use of Gilmore's name, image, likeness and association as described herein violates 15 U.S.C. §1125(a) and was wrongful.

224.    Defendants had actual or constructive knowledge of the wrongfulness of their conduct, acted with intent to deprive Gilmore of a property interest, and further acted with actual or constructive knowledge of the high probability that injury or damage would result to Plaintiff.

225.    The method and manner in which Defendants used the name, image, likeness, and association are evidence that Defendants were aware of or consciously disregarded the fact that Gilmore did not consent to Defendants' continued use of Gilmore's name, image, likeness, and association to advertise Defendants' business.

226.    Defendants' unauthorized use of Gilmore's name, image, likeness, and association directly and proximately caused and continue to cause damage to Plaintiff in an amount to be determined at trial.

227.    Defendants' wrongful conduct as described herein was willful.

228.    As such, the present case warrants an award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

WHEREFORE, on this count, Plaintiff Gilmore respectfully requests that the Court issue a judgment against Defendants and grant actual, or compensatory, damages in an amount to be determined at trial, lost profits, disgorgement of profits earned directly or indirectly by Defendants' unlawful use, attorneys' fees and costs, prejudgment and post-judgment interest, and/or such further relief that is just and proper.

### Count VIII - Violation of Fla. Stat. § 540.08: Right of Publicity

### (Plaintiff Gilmore against Defendants)

229.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein. Plaintiff Gilmore has a statutory right of publicity under Section 540.08, Florida Statutes, which protects her right to control and profit from commercial use of her name, likeness, and persona.

38

230.    Section 540.08, Florida Statutes, provides that: "[n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use."

231.    Despite the clear language of Section 540.08, Defendants continued to publish Gilmore's name, image, likeness and association on OnBalance's website long after Gilmore's association and any contractual relationship with OnBalance ended, long after OnBalance ceased paying PSC or Gilmore for the right to do so,  and long after Gilmore even had legal counsel write Defendants regarding legal claims that Gilmore had against Defendants, in order to promote, advertise and market OnBalance.

232.    Defendants never sought permission or authority to use Gilmore's name, image, likeness and association on OnBalance's website after Gilmore's association and any contractual relationship with OnBalance ended.

233.    Gilmore never consented to, permitted, assigned, licensed, or otherwise agreed to Defendants' use of Gilmore's name, image, likeness and association on OnBalance's website after Gilmore's association and any contractual relationship with OnBalance ended.

234.    Defendants intentionally or, at a minimum, recklessly published, printed, displayed, or otherwise publicly disseminated or used Gilmore's name, image, likeness and association after Gilmore's association and any contractual relationship with OnBalance ended, without Gilmore's express written or oral consent, for purposes of trade or for other commercial or advertising purposes as detailed in this Complaint.

235.    Defendants had actual or constructive knowledge of the wrongfulness of their conduct and acted with intent or with reckless disregard to deprive Gilmore of a property interest during the entire time period in which the unauthorized use took place.

236.    At a minimum, Defendants' conduct was so reckless or wanton in care that it constituted a conscious disregard of or indifference to Gilmore's rights.

237.    Alternatively, Defendants acted negligently towards Gilmore in using and disseminating, without authority, Gilmore's name, image, likeness and association on OnBalance's website and otherwise in order to promote, advertise and market OnBalance.

238.    Defendants have damaged Gilmore as a direct and proximate result of their unauthorized use of Gilmore's name, image, likeness and association without compensating Gilmore. Defendants' conduct has been taken in conscious disregard of Gilmore's rights.

WHEREFORE, on this count, Plaintiff Gilmore respectfully requests that the Court issue a judgment against Defendants for all remedies available under Fla. Stat. § 540.08, including but not limited to, both actual loss and damages, costs, interest, royalties, and restitution of Defendants' unlawful proceeds, including Defendants' profits and other relief deemed just and proper by this Court.

### Count IX - Violation of Common Law Right of Publicity
### (Plaintiff Gilmore against Defendants)

239.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein. Plaintiff Gilmore has a common law right of publicity, which protects her right to control and profit from commercial use of her name, likeness, and persona.

240.    Defendants may not publish, print, display or publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of Gilmore without express written or oral consent to such use.

241. Defendants published, printed, displayed and/or publicly used Gilmore's name, image, likeness and association, long after Gilmore's association and any contractual relationship with OnBalance ended, long after OnBalance ceased paying PSC or Gilmore for the right to do so, and long after Gilmore even had legal counsel wrote Defendants regarding legal claims that Gilmore had against Defendants, in order to promote, advertise and market OnBalance on OnBalance's website and in other manners for purposes of trade and/or commercial advertising including, but not limited to, promoting, advertising and marketing of OnBalance's business.

242. Defendants took these actions without Gilmore's permission, consent or authority.

243. Defendants intentionally or, at a minimum, recklessly, published, printed, displayed, or otherwise publicly disseminated or used Gilmore's name, image, likeness and association, without her express written or oral consent, for purposes of trade or for other commercial or advertising purposes as detailed in this Complaint.

244. Defendants had actual or constructive knowledge of the wrongfulness of their conduct and acted with intent or with reckless disregard to deprive Gilmore of a property interest during the entire time period in which the unauthorized use took place.

245. At a minimum, Defendants' conduct was so reckless or wanton in care that it constituted a conscious disregard of or indifference to Gilmore's rights.

246. Alternatively, Defendants acted negligently towards Gilmore in using and disseminating, without authority, Gilmore's name, image, likeness and association on OnBalance's website and otherwise in order to promote, advertise and market OnBalance.

247. Defendants have damaged Gilmore as a direct and proximate result of their unauthorized use of Gilmore's name, image, likeness and association without compensating Gilmore. Defendants' conduct has been taken in conscious disregard of Gilmore's rights.

41

WHEREFORE, on this count, Plaintiff Gilmore respectfully requests that the Court issue a judgment against Defendants for all remedies available under a claim of misappropriation including, but not limited to, actual damages, costs, interest, and restitution of Defendants' unlawful proceeds, including Defendants' profits and other relief deemed just and proper by this Court.

## COUNT X – PROMISSORY ESTOPPEL

### (Plaintiff Hall against Defendant Norley)

248.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

249.    During Plaintiff Hall's employment with OnBalance, Norley made promises and representations that would reasonably be expected to induce Plaintiff to continue working for OnBalance without receiving wages owed and to forbear taking legal against Defendants at that time.

250.    In reasonable reliance on promises and representations made by Norley, Plaintiff Hall continued working for OnBalance without receiving wages owed and to forbear taking legal against Defendants at that time.

251.    Plaintiff Hall relied to his detriment on the promises and misrepresentations made by Norley.

252.    Injustice can be avoided only by enforcing the promises made by Norley to Plaintiff Hall.

253.    Accordingly, the Plaintiff Hall is entitled to judgment in an amount equal to the benefits promised by Norley and for damages suffered as a result of Plaintiff Hall's reliance on Norley's promises that resulted in Plaintiff continuing work for OnBalance in lieu of other opportunities.

42

WHEREFORE, Plaintiff Hall demands judgment against Defendant Norley in a sum to be determined by the trier of fact plus interest and costs.

## Count XI – Breach of Fiduciary Duty

### (Plaintiff PSC against Defendants)

254.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

255.    Norley represented to Gilmore that he and OnBalance created an escrow account for the benefit of PSC, that he and OnBalance was placing the monies due to PSC under the PSC Consultant Agreement into said escrow account, and that he and OnBalance maintained the account and those funds for PSC.

256.    In doing so, Norley and/or OnBalance became charged with the fiduciary duty of, among other duties, acting with due care as an escrow agent.

257.    As such, based on the foregoing, the relationship of the parties as to the alleged escrow account and the superior knowledge of the Defendants regarding the same, the Defendants owed a fiduciary duty to Plaintiff PSC.

258.     Upon information and belief, there is no such escrow account and never was one. Whether there ever was one or not, based on the current status and the transactions (or lack thereof) regarding the monies due to PSC under the PSC Consultant Agreement that were to be placed into said escrow account, Defendants have breached a fiduciary duty to Plaintiff PSC.

259.    As a direct and proximate result of this breach, Plaintiff PSC has been injured.

WHEREFORE, Plaintiff PSC demands judgment against Defendant Norley in a sum to be determined by the trier of fact plus interest and costs.

43

## Count XII – Negligence and Wantonness

### (Plaintiff PSC against Defendants)

260.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

261.    Norley represented to Gilmore that he and OnBalance created an escrow account for the benefit of PSC, that he and OnBalance was depositing the monies due to PSC under the PSC Consultant Agreement into said escrow account, and that he and OnBalance maintained the account and those funds for PSC.

262.    In doing so, Norley and OnBalance undertook and owed a duty to PSC to administer and handle the monies due to PSC under the PSC Consultant Agreement in a reasonable and prudent manner and with due care.

263.    Defendants were negligent and wanton in their actions regarding the monies due to PSC under the PSC Consultant Agreement that were to be placed into said escrow account.

264.    As a direct and proximate result of this negligence and wantonness, Plaintiff PSC has been injured.

WHEREFORE, Plaintiff PSC demands judgment against Defendants in a sum to be determined by the trier of fact plus interest and costs.

## Count XIII – Negligence and Wantonness

### (Plaintiff Hall against Defendant Norley)

265.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

266.    Norley's representations as set out in the Statement of Facts section of this Complaint contained material facts that were made by Norley by mistake, but with the intention that Plaintiff Hall should rely on these facts.

44

267. Among others, Norley made the following misstatements:

- As of August of 2024, OnBalance already had the money in place to pay Hall's salary for at least two-plus years, regardless of future sales, business or additional financing, because based on OnBalance's then-existing financial records and cash balances, the company already had more than sufficient cash reserves on hand to fund at least 24-plus months of operations and expenses, including all payroll and operating costs for Hall, the existing employees, and all planned new hires, without the need for any additional financing.

- As of July 10, 2025, OnBalance's payroll was covered through the year because "(t)he OnBalance board of directors has each written me $250,000 checks" and that he (Norley) "was on his way to the bank to deposit the checks and cut payroll checks and get (Hall) caught-up on his pay."

- Hall would get paid his salary payments very soon as there was great news in that, as of August 11, 2025, "the Series B investors have signed their paperwork, and I am just waiting for investment checks to clear."

268. As the CEO and managing principal of OnBalance, Norley should have known the truth about the financial condition and operations of OnBalance.

269. Defendant Norley was negligent and wanton in his actions regarding these misstatements.

270. Plaintiff Hall believed these misstatements, and in reasonable reliance on the misstatements, acted to his detriment by entering into the Employment Agreement with OnBalance, and by continuing to work at OnBalance longer than he would have had the representations not been made.

271. Had the misrepresentations set out above not been made by Norley, Plaintiff would have never resigned his employment at his previous employer and entered into the Employment Agreement with OnBalance or continued to work, unpaid, at OnBalance for the amount of time that he did.

272. Defendant Norley personally made the aforesaid fraudulent misrepresentations to Plaintiff.

273.    As a proximate result of the aforesaid misrepresentations, Plaintiff suffered damages, including but not limited to loss of compensation, loss of fees, loss of valuable financial opportunities, lost time value of money, interest and costs and emotional distress.

274.    As a direct and proximate result of this negligence and wantonness, Plaintiff Hall has been injured.

WHEREFORE, Plaintiff Hall demands judgment against Defendants in a sum to be determined by the trier of fact plus interest and costs.

**<u>Count XIV – Fraudulent Misrepresentation and Concealment</u>**

**(Plaintiffs Gilmore and PSC against Defendant Norley)**

275.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein. Norley's representations made to Plaintiff Gilmore and PSC as set out in the Statement of Facts section of this Complaint regarding the existence and maintenance of a separate escrow account in which he placed and maintained funds owed to and for the benefit of Gilmore and PSC contained material facts that (a) Norley knew were false, or (b) Norley, without knowledge of the true facts, recklessly and/or negligently misrepresented the true facts.

276.    Plaintiffs Gilmore and PSC believed these misrepresentations, and in reasonable reliance on the misrepresentations, acted to their detriment by continuing to provide the consulting services under the PSC Consultant Agreement without payment, not legally pursuing the unpaid PSC funds at the time, by Gilmore resigning her employment at UA and entering into the Gilmore Employment Agreement with OnBalance, and by Gilmore continuing to work at OnBalance longer than she would have had the representations not been made.

277.    Had the misrepresentations set out above not been made by Norley, Plaintiff PSC would have not continued to provide the consulting services under the PSC Consultant Agreement without payment, would have legally pursued the unpaid PSC funds at the time, and certainly

46

Gilmore would have never resigned her employment at UA and entered into the Employment Agreement with OnBalance.

278. Defendant Norley personally made the aforesaid fraudulent misrepresentations to Gilmore.

279. Defendant Norley fraudulently concealed and/or failed to disclose to the Plaintiffs PSC and Gilmore the following material facts which he was under a duty to disclose that: a) the PSC consulting fees owed to PSC for services rendered under the PSC Consultant Agreement had not been put in "the escrow account" and that the escrow account did not, in fact, exist; b) Norley had chosen just not to pay the PSC consulting fees owed to PSC for services rendered under the PSC Consultant Agreement; c) OnBalance either could not pay the consulting fees owed to PSC for services rendered under the PSC Consultant Agreement or, on behalf of OnBalance, he was choosing not to pay the PSC consulting fees owed to PSC for services rendered under the PSC Consultant Agreement; and d) the true status of OnBalance's finances and business that conflicted with his misrepresentations regarding OnBalance's capital raising successes and moneys paid into OnBalance.

280. Defendant Norley's suppression, concealment and nondisclosure induced the Plaintiffs PSC and Gilmore to continue to perform services and work for OnBalance, to continue to provide the consulting services under the PSC Consultant Agreement without payment, to not legally pursuing the unpaid PSC funds at the time, Gilmore to resign her employment at UA and to enter into the Gilmore Employment Agreement with OnBalance, and to continue to work at OnBalance longer than she would have had the representations not been made.

281. Defendant Norley personally participated in the fraudulent concealment of the above-referenced material facts.

47

282.    As a proximate result of the aforesaid fraudulent misrepresentations and concealments, Plaintiffs Gilmore and PSC suffered damages, including but not limited to loss of compensation, loss of fees, loss of valuable financial opportunities, lost time value of money, interest and costs and for Plaintiff Gilmore, emotional distress.

WHEREFORE, Plaintiffs Gilmore and PSC demand judgment against Defendant Norley in a sum to be determined by the trier of fact plus interest and costs.

### Count XVI – Fraudulent Misrepresentation

### (Plaintiff Hall against Defendant Norley)

283.    Plaintiffs adopt by reference each and every material averment above as if fully set forth herein.

284.    Norley's representations as set out in the Statement of Facts section of this Complaint contained material facts that (a) Norley knew were false, or (b) Norley, without knowledge of the true facts, recklessly misrepresented the true facts.

285.    Among others, Norley made the following misrepresentations:

- As of August of 2024, OnBalance already had the money in place to pay Hall's salary for at least two-plus years, regardless of future sales, business or additional financing, because based on OnBalance's then-existing financial records and cash balances, the company already had more than sufficient cash reserves on hand to fund at least 24-plus months of operations and expenses, including all payroll and operating costs for Hall, the existing employees, and all planned new hires, without the need for any additional financing.

- As of July 10, 2025, OnBalance's payroll was covered through the year because "(t)he OnBalance board of directors has each written me $250,000 checks" and that he (Norley) "was on his way to the bank to deposit the checks and cut payroll checks and get (Hall) caught-up on his pay."

- Hall would get paid his salary payments very soon as there was great news in that, as of August 11, 2025, "the Series B investors have signed their paperwork, and I am just waiting for investment checks to clear."

48

286.     As the CEO and managing principal of OnBalance, Norley knew or should have known the truth about the financial condition and operations of OnBalance.

287.     Plaintiff Hall believed these misrepresentations, and in reasonable reliance on the misrepresentations, acted to his detriment by entering into the Employment Agreement with OnBalance, and by continuing to work at OnBalance longer than he would have had the representations not been made.

288.     Had the misrepresentations set out above not been made by Norley, Plaintiff would have never resigned his employment at his previous employer and entered into the Employment Agreement with OnBalance or continued to work, unpaid, at OnBalance for the amount of time that he did.

289.     Defendant Norley personally made the aforesaid fraudulent misrepresentations to Plaintiff.

290.     As a proximate result of the aforesaid fraudulent misrepresentations, Plaintiff suffered damages, including but not limited to loss of compensation, loss of fees, loss of valuable financial opportunities, lost time value of money, interest and costs and emotional distress.

291.     Accordingly, the Plaintiff Hall is entitled to judgment in an amount to be determined at trial.

WHEREFORE, Plaintiff Hall demands judgment against Defendant Norley in a sum to be determined by the trier of fact plus interest and costs.

**PRAYER FOR RELIEF**

Plaintiffs respectfully pray that this Court grant judgment to Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial and as follows:

A.     Judgment against the Defendants for all available and allowable compensatory and punitive damages of any type as will be determined by a jury at trial of this cause, plus interest and

costs;

B.      Damages for all unpaid wages, liquidated damages, pre- and post- judgment interest and attorney's fees and costs to which Plaintiffs are lawfully entitled under the state and federal statutes set forth in this Complaint; and

C.      Other and further relief as the referenced and applicable statutes and common law dictate and that this Court deems equitable, proper, and just, including but not limited to, any injunctive and/or declaratory relief to which Plaintiffs may be entitled.

## JURY DEMAND

Plaintiffs demand a trial by jury on all triable issues.

DATED this 11th day of May, 2026.

Respectfully submitted,

 /s/ Lane L. Vines
Lane L. Vines (PA Bar No. 80854)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-4658
Email: lvines@bergermontague.com

*Local Counsel for Plaintiffs*

David A. Hughes*
HARDIN & HUGHES, LLP
1490 Northbank Parkway, Suite 234
Tuscaloosa, AL 35406
Tel.: (205) 523-0463
Email: dhughes@hardinhughes.com

* *Pro hac vice* forthcoming

*Lead Counsel for Plaintiffs*

50